IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DAVID BOETTCHER,

                Plaintiff,

      vs.

KILOLO KIJAKAZI, Acting Commissioner of
the Social Security Administration;

                Defendant.

**8:21CV31**

**MEMORANDUM AND ORDER**

      This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner").  Plaintiff David Boettcher appeals a final determination of the Commissioner denying his application for disability benefits, Filing No. 20 (Plaintiff's Motion to Reverse) and Filing No. 22 (Defendant's Motion to Affirm). This Court has jurisdiction to review this matter under 42 U.S.C. § 405(g).

**I.    BACKGROUND**

    A.    Procedural history.

      Plaintiff David Boettcher filed an application for Title II benefits disability benefits on July 24, 2018, alleging he suffered from a disability that began on February 14, 2017, due to back pain.  Filing No. 17, Administrative Transcript ("Tr."), Filing No. 17-2,  Tr. at 10.  His application was initially denied and on reconsideration, he was granted a telephonic hearing before an Administrative Law Judge ("ALJ") on June 8, 2020. *Id.*  After the hearing, the ALJ issued an unfavorable decision.  *Id.*, Tr. at 10–23.  The Appeals Council denied review, making the ALJ's decision the final agency decision.  *Id.*, Tr. at 1.

B.      Hearing Testimony and Related Evidence

Boettcher was born on August 18, 1976, and was 43 years old at the time of the hearing on June 8, 2020.  *Id.*, Filing Nos. 17-5, Tr. at 156; and 17-6, Tr. at 216.  Boettcher has at least a high school education and is able to communicate in English.  *Id.*, Filing No. 17-2, Tr. at 22.  He testified he has past relevant work as a drywall finisher, field auditor, and an inbound customer service representative.  *Id.*, Tr. at 41.

Boettcher testified he suffered an on-the-job injury in 2014.  *Id.*, Tr. at 38.  On August 25, 2014, he was injured "when he bent and twisted for a part in a tool bag and experienced immediate pain in his lower back and right buttock."  *Id.*, Filing No. 17-5,Tr. at 187.  He was then working as a field loss auditor and that work required him to carry a ladder and a bag of tools on his shoulders to and from different locations to make certain inspections.  *Id.*, Filing No. 17-2, Tr. at 41–42.  As a result of his injury, Boettcher transitioned to a job as a customer service representative where he had a sit/stand workstation to accommodate his back and leg pain.  *Id.*

Boettcher testified he has had three surgeries on his back:  one in February 2015, one in February 2016, and one in February 2017.  *Id.*, Tr. at 38.  He returned to work only for a short time after the surgery in Feb 2016.  *Id.*, Tr. at 38–39.  In 2016, Boettcher earned approximately $4000.00.  *Id.*, Tr. at 38.  Boettcher stated that he had "little improvement with the back pain" since his last procedure in February 2017 when a spinal cord stimulator was inserted in his back.  *Id.,* Tr. at 41–42.  He experienced only minor improvement with the leg pain after that procedure.  *Id.*

He returned to work in October 2017 but was only able to work for approximately four hours a day.  *Id.*, Tr. at 39.  When he went back to work, he could only sit for 30

2

minutes to an hour, and, as the day progressed, he could sit for only 20 minutes. *Id.* He said that he had to continuously change positions from sitting to standing at work beginning each day with intervals of around 30 minutes. *Id.*, Filing No. 17-2, Tr. at 41. The time interval got shorter throughout the day until Boettcher needed to "go home to take medication and lay down." *Id.* Boettcher testified that the most he was able to work in a day after February 2017 was four hours. *Id.,* Tr. at 40. In February 2018, Boettcher's employer notified him that he could no longer be accommodated at work, after it received letters from Boettcher's doctors that stated that he could only work three to five hours per day because of his condition. *Id.*, Tr. at 47.

Boettcher stated that, on an average day, his pain level would be about four to five on a scale of one to ten but would rise as high as seven or an eight after activity. *Id.*, Tr. at 42–43. He stated that he frequently has to lie down to relieve the pain. *Id.*, Tr. at 43. Boettcher takes medication in addition to lying down whenever the pain rises to this level. *Id.*, Tr. at 42–44. He testified he takes numerous pain medications and suffers from short term memory loss as a result of those medications.[1] *Id.,* Tr. at 42. He approximated that he spends 70 percent of the day lying down. *Id.*, Tr. at 44–45.

He testified that on a typical day, he would wake up and lie in bed for a while to relieve back pain from sleeping, then get up for breakfast, then lie down again, then get up and tinker around, then eat lunch and lie down again. *Id.*, Tr. at 43–44. Tinkering around would be doing some light woodworking, picking up around the house, putting

---

[1] The record shows Boettcher has been prescribed Buprenorphine in a patch, Hydrocodone/ Acetaminophen, Tizanidine, Acetaminophen, Duloxetine Dr., Pregabalin, and Topiramate to relieve his pain. *Id.,* Filing No. 17-6, Ex. 18E, Tr. at 285-87. He has also been prescribed Lyrica, Cymbalta, Zonegran, Voltaren, Tramadol, Elavil, and Flexeril, with varying degrees of success. Filing No. 17-8, Tr. at 567; Filing No. 17-9, Tr. at 661.

dishes away, and playing with the dog. *Id.*, Tr. at 44. Boettcher's wife completed a form substantiating his daily activities. *Id.*, Filing No. 17-6, Tr. at 238–40. She explained that her husband "reclines in his chair most of the day as standing, sitting upright and walking cause discomfort and pain in his back." *Id.*, Tr. at 238.

A vocational expert ("VE"), Sugi Y. Komarov, also testified at the hearing. *Id.*, Filing No. 17-2, Tr. at 46–49. He was asked to assume a hypothetical person with no past relevant work, who was able to perform sedentary work as that term is defined in the Dictionary of Occupational Titles ("DOT") and was able to stoop, kneel, crouch, and crawl and climb only occasionally and able to perform work so long as it did not require sustained exposure to concentrated extreme cold or vibration. *Id.*, Tr. at 47. The VE testified there would be jobs for that individual in the national economy such as those of a semi-conductor bonder, food beverage order clerk, and a circuit layout taper. *Id.*, Tr. at 47. He stated that if the hypothetical were altered to assume a person could do the work for only three to five hours per day, there would not be jobs in the national economy that the individual could perform. *Id.*, Tr. at 48.

C.   Medical evidence

Medical records show that Boettcher underwent three back surgeries to address his 2014 work injury. *Id.*, Filing No. 17-5, Tr. at 187. On February 5, 2015, he underwent an interbody fusion of the anterior lumbar with instrumentation at L5-S1. *Id.* He underwent a posterior lumbar interbody fusion at L5-S1 on February 4, 2016. *Id.* On February 13, 2017, Timothy Burd, M.D., implanted a spinal cord stimulator. *Id.* Dr. Burd performed a "bilateral laminectomy with decompression at T8-9 with placement of Penta Jude paddle leads at T7-8." *Id.*, Filing No. 17-7, Tr. at 471. On March 28, 2017, Boettcher

4

reported to Dr. Burd that he was experiencing ongoing pain in his lower back and legs that grew worse as he sat or stood for prolonged periods of time and when he looked down. *Id.,* Tr. at 366. Dr. Burd examined Boettcher and noted that he experienced pain with movement and was limping. *Id.* Dr. Burd prescribed physical therapy and recommended that Boettcher remain away from work for four weeks. *Id.*, Tr. at 367.

In May 2017, Boettcher reported to Dr. Burd hat he had "good coverage in his right leg, partial coverage in his low back pain, [but] no relief for his left leg pain from his spinal cord stimulator." *Id.*, Tr. at 414. Dr. Burd noted Boettcher could not sit or stand for extended periods of time. *Id.* Dr. Burd diagnosed lumbago, post-laminectomy syndrome, thoracic pain, pain in the right leg, and pain in the left leg. *Id.*, Tr. at 417. Dr. Burd found Boettcher was unable to return to work at that time and ordered a functional capacity evaluation ("FCE"). *Id.*, Tr. at 415, 417.

Kyle Meyer, PT, DPT, performed the FCE on July 18, 2017, and found that Boettcher was able to work at a sedentary level, but required position changes every hour to manage his pain. *Id.*, Tr. at 291; Filing No. 17-9, at 679-682. Additionally, Meyer noted that Boettcher would also need to occasionally lie down to mitigate his pain. *Id.*, Tr. at 681. He noted that Boettcher "benefited from frequent position changes" and recommended that Boettcher use a sit/stand desk to accommodate Boettcher's need to change positions. *Id.*, Tr. at 679.

Following the FCE, Boettcher had an appointment with Dr. Burd on July 20, 2017, and reported pain in his lower back and legs ranging at a level of 3 to 8 out of 10 that day. Filing No. 17-7, Tr. at 420. Boettcher expressed concern about his condition preventing him from going back to work. *Id.,* Tr. at 424. Dr. Burd ordered a CT scan of Boettcher's

5

lumbar spine to ensure the old fusion was completely fused, referred Boettcher to Scott Haughawout, D.O., for pain management, and ordered Boettcher not to work until further notice. *Id.*, Tr. at 426, 473.

The CT scan, showed "[a]natomic alignment with the appearance of slight increase [in the] amount of graft material within the disc space," which was consistent with a "continued progression of disc space fusion at L5-S1." *Id.*, Tr. at 473–74. The radiologist also found "[posterolateral fusion between L5 and S1 bilaterally and noted that an "[a]rtifact overlying the L5-S1 disc space, limits interpretation of the fusion." *Id.,* Tr. at 473. The radiologist stated, "[t]he disc spaces at L1-2 through L4-5 remain at normal height. There is no area of new central foraminal stenosis." *Id.*

Boettcher met with pain specialist Dr. Haughawout on August 28, 2017. *Id.*, Tr. at 430. Dr. Haughawout planned to discontinue hydrocodone and provided Boettcher with 5 mcg Butrans pain relief patches which would provide for "more all day coverage" and recommended that he "continue with [] spine medications" other than hydrocodone. Filing No. 17-7 at 430. Dr. Haughawout later increased the dosage of the Butrans patches to 10 mcg because Boettcher was not "seeing adequate pain relief." *Id.*, Tr. at 433. Dr. Haughawout continued to keep Boettcher off work due to Boettcher's condition. *Id.* He discussed the possibility of replacing Boettcher's spinal cord simulator with a different spinal cord stimulator and decided to discuss that possibility with Dr. Phillip E. Essay, M.D. *Id.,* Tr. at 431.

On October 5, 2017, Boettcher returned to Dr. Haughawout reporting continued pain. *Id.*, Tr. at 433. Dr. Haughawout again increased the dosage of the Butrans patches to 15 mcg and also prescribed a low dose of hydrocodone to be used a maximum of twice

a day. *Id.*, Tr. at 437. Dr. Haughawout released Boettcher to work with "restrictions per FCE" and instructed Boettcher to follow up with him after meeting with Dr. Essay. *Id.*, Tr. at 438. Boettcher was working on restriction and didn't report much improvement after Dr. Haughawout increased the Butrans patches to 15 mcg. *Id.*, Tr. at 449.

Boettcher was seen by Dr. Phillip E. Essay, M.D., on November 7, 2017. *Id.*, Tr. at 444. Dr. Essay informed Boettcher that the other spinal cord stimulator would be more effective than the device that he had at the time. *Id.* However, Dr. Essay later determined that Boettcher's "surgical lead is not in position to be able to convert his current lead array to [the other stimulator]." *Id.*, Tr. at 446. Dr. Essay conveyed that information on Dr. Burd who, in turn, was not in favor of switching the devises. *Id.* Dr. Essay therefore recommended that Boettcher continue pain management with Dr. Haughawout instead of switching devices. *Id.*, Tr. at 448.

Dr. Haughawout also reviewed the FCE and concluded that Boettcher would be able to continue working if given accommodations to change his position. *Id.*, Filing No. 17-9, Tr. at 662. Boettcher was seen again by Dr. Haughawout on January 9, 2018. He reviewed Dr. Essay's assessment on the risks and inability of replacing Boettcher's spinal cord stimulator. Filing No. 17-7, Tr. at 449. Boettcher was then working on restriction but had not improved much on the increased Butrans patch dosage. *Id.* Dr. Haughawout concluded that Boettcher would perpetually require pain management and stated that Boettcher had reached maximum medical improvement. *Id.,* Tr. at 452.

In March 2018, Dr. Haughawout noted

Patient currently describes, again, the pain over the mid and lower back, bilateral legs. He states silting, standing, walking all exacerbate the pain. Lying down is the most comfortable for him. With all this, he finds it both difficult lo fall asleep as well as stay asleep secondary to pain and

7

> discomfort.  He overall rates his pain anywhere from a 3 to an 8/10. Describes it as a throbbing, shooting, stabbing, sharp, aching, tender pain. This does affect general activity, mood, ability to walk, normal work routine, relationships with others, sleep, enjoyment of life, ability to concentrate.

Filing No. 17-9, Tr. at 661.  He also stated that Boettcher had "been treated In the past with multiple epidural injections which he slates were of no benefit[,]" had been treated with gabapentin without relief, and had to discontinue Elavil because it made him angry. *Id.*  Further, he noted Boettcher had "undergone multiple episodes of physical therapy which he feels has been of no benefit.  He has seen pain psychologist/psychiatrist, he slates undergone relaxation techniques and biofeedback.  None of this has provided any relief." *Id.*  Dr. Haughawout also noted the Boettcher's most recent CT of lumbar spine in July 2017 showed postsurgical change diskectomy at L5-S1, hardware in place, and some increased bone graft material since previous scan.  *Id.*

In March 2018, Mr. Boettcher established care with Dr. Stephen Hosman, M.D., for pain management.  *Id.*; Filing No. 17-8, Tr. at 567.  Boettcher reported his pain ranged from three to eight on a scale of one to ten out of 10.  *Id.*  He also stated that his pain affected his memory and his ability to concentrate.  *Id.*  Dr. Hosman continued the Butrans patch at 15 mcg and prescribed hydrocodone for breakthrough pain as well as Lyrica.  *Id.*  Dr. Hosman also adjusted Boettcher's Cymbalta timing (not overall dose) and added Zonegran and Voltaren.  *Id.*  Dr. Hosman also prescribed warm water physical therapy. *Id.*

On April 27, 2018, Mr. Boettcher returned to Dr. Hosman and reported he remained in significant pain, which he rated at 5 out of 10.  *Id.*, Tr. at 572.  Physical examination showed Boettcher had decreased sensation over the posterior and lateral calf bilaterally and positive leg lifts bilaterally at approximately 60 degrees.  *Id.*  Dr. Hosman performed

8

an epidural steroid injection at the L5-S1 level. *Id.*, Tr. at 573–74. In May 2018, Boettcher returned to Dr. Hosman for pain management and reported that the epidural steroid injection had not provided any relief. *Id.*, Tr. at 565.

Boettcher reported to Dr. Hosman, at a September 5, 2018, appointment that his current medications and the aqua therapy were helpful and that he had "been able to increase his activity level [and was] [s]leeping okay." *Id.*, Tr. at 565. Dr. Hosman, therefore, didn't alter Boettcher's treatment. *Id.* On exam, Mr. Boettcher had decreased sensory bilateral calves and legs and positive leg lifts bilateral at approximately 60 degrees. *Id.* Boettcher continued to be treated by Dr. Hosman throughout 2019, reporting pain at levels of four to six. *Id.*, Tr. at 561–603. On September 6, 2019, on exam, Mr. Boettcher had positive leg lifts bilaterally at approximately 80 degrees with back pain. *Id.*, Tr. at 625–26. He had diffuse tenderness over the mid and lower lumbar spine and over the buttocks. *Id.*

Opinion evidence in the record shows that treating surgeon Dr. Burd agreed with the FCE restriction to sedentary work and stated Boettcher had achieved maximum medical improvement. *Id.*, Filing No. 17-5, Tr. at 187. He stated

> Despite the fact that Mr. Boettcher had a valid FCE (7-18-17) placing him at sedentary demand, he has been unable to [return to work for more than or equal to] 3 [hours per day]. At best he has worked up to 5 in split-shifts. I do not believe Mr. Boettcher is able to work a 40 [hour] work week at his current position. Although [his employer] has been accommodating it is questionable whether or not he will be able to work at a type of labor position for [more than] 3-5 [hours per] day.

*Id.* Dr. Hosman reviewed Boettcher's July 18, 2017, FCE and Dr. Burd's November 28, 2017, recommendations. Filing No. 17-5, Tr. at 197. He concurred that Boettcher was "more likely than not limited to part-time sedentary activity with regular alternating

changes necessary due to pain." *Id.*  Dr. Hosman also agreed that Boettcher would require continuing medical care and recommended aqua therapy.  *Id.*, Tr. at 198.

In an updated report on June 19, 2018, Dr. Burd agreed with Dr. Hosman that Boettcher "is more likely than not limited to part-time sedentary activity with regular alternating position changes due to pain." Filing No. 17-9, Tr. at 658.  Dr. Burd also felt that Boettcher was "not a malingerer and did not demonstrate drug-seeking behaviors" during treatment.  *Id.*  He also reaffirmed his November 28, 2017, questionnaire was appropriate based on Boettcher's complaints. *Id.*

Boettcher pursued the recommended physical and aquatic therapy.  Boettcher attended aquatic therapy with Jill Knoell, PT, from August 8, 2018, to November 21, 2018. *Id.*, Filing No. 17-8 at 545–56; Filing No. 17-7, Tr. at 371–434; Filing No. 17-6 Tr. at 282.

D.     The ALJ's Decision

The ALJ found Boettcher was not disabled.  *Id.*, Filing No. 17-2, Tr. at 7–28.  The ALJ explained that "[t]he primary (if not sole) factual issue presented here is whether the claimant is able to perform sedentary work full time or whether he is limited to part-time work."  *Id.*, Filing No. 17-2, Tr. at 18.

The ALJ undertook the standard five-step sequential process for analyzing and determining disability.  *Id.* at 12–22.  At the first step of the evaluation, he found that the claimant engaged in substantial gainful activity from October 12, 2017 through February 5, 2018, because "during that time his earnings exceeded the monthly amount for at least one month" but found that "even if the undersigned finds that the claimant had not engaged in substantial gainful activity during this period, he would still be found not disabled for the entire period at issue, as discussed below."  *Id.* at 13.  The ALJ then

found Boettcher had the following severe impairment:  degenerative disc disease with

residuals of surgery (20 CFR 404.1520(c)).  *Id.*  He next concluded that Boettcher's

impairments or combination of impairments did not meet or medically equal the severity

of any listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §

404.1520(d), 404.1525 and 404.1526), so as to render him presumptively disabled.  *Id.*

at 13.  He made that finding as to Boettcher's impairment after considering Listing 1.04

(disorders of the spine).[2]   The ALJ found

> an MRI showed a paracentral disc extrusion at T5-T6 with mild central canal
> stenosis, mild foraminal stenosis at T1-T3, and a small paracentral disc
> protrusion at T6-T7.  (Ex. 2F at 171). {461} A CT scan showed normal disk
> spaces and height at L1-L5 (Ex. 8F at 16) {618}. Thus, diagnostic imaging
> does not establish compromise of a nerve root, spinal arachnoiditis, or
> lumbar spinal stenosis.  Treatment notes reflect complaints of radiculopathy
> with intermittent limitations in range of motion, and sensory and reflex
> deficits, but no weakness or atrophy, and no persistent positive straight leg
> raise testing.

*Id.*  He based that conclusion on a lack of evidence of weakness or atrophy and no

persistent and positive straight leg raising, though he did find "[t]treatment notes reflect

complaints of radiculopathy with intermittent limitations in range of motion, and sensory

and reflex deficits." *Id.* at 14.  Although he found that Boettcher's medically determinable

impairments could reasonably produce at least some of the alleged symptoms, he found

BOE's allegations as to the nature, intensity, persistence, and limiting effects of those

---

[2] Listing 1.04 requires

> that the spinal disorder results in a compromise of a nerve root (including the cauda equina)
> or the spinal cord, with additional findings of: (A) evidence of nerve root compression
> characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor
> loss (atrophy with associated muscle weakness or muscle weakness) accompanied by
> sensory or reflex loss and positive straight-leg raising or; (B) spinal arachnoiditis or; (C)
> lumbar spinal stenosis resulting in pseudoclaudication and inability to ambulate effectively.

*See* 20 CFR Part 404 Subpart P, Appendix I, 1.04.

symptoms were not fully substantiated by the medical signs, laboratory findings and other evidence of record. *Id.*, Tr. at 16.

He discounted the opinions of treating physicians "suggesting the claimant is limited to part-time work or needs more than typical breaks" finding them "unpersuasive, as they are insufficiently supported by the medical evidence or by common experience." *Id.* at 19. Instead, he found the opinions of state agency consultants persuasive since they were supported by the agency consultants' review of the evidence and were consistent with the medical records and common experience. *Id.*

Based on the opinion of the state agency consultants, the ALJ next determined that Hubbard had the residual functional capacity ("RFC") to perform full-time sedentary work as defined in 20 C.F.R. § 404.1567(a), "except he can stoop, kneel, crouch, crawl, and climb stairs only occasionally. He can perform work that does not require sustained exposure to concentrated extreme cold or vibration." *Id., Tr.* at 14. The ALJ found given Mr. Boettcher's age, education, and RFC, he could perform sedentary unskilled work as a semiconductor bonder, food beverage order clerk, or circuit layout taper. *Id.* at 22–23.

On appeal, Boettcher contends the ALJ erred in failing to credit his subjective complaint of pain and functional limitations. He argues that that his consistent work history before his onset date, his multiple attempts to return to work, and medical records before applying for disability insurance support his credibility. Additionally, Boettcher argues the ALJ did not provide good reasons for finding that he was not credibly reporting his limitations. Boettcher also argues that the ALJ did not articulate sufficient reasons for finding the treating options and the FCE unpersuasive. Finally, he contends that the ALJ erred by not fully and fairly developing the record.

12

II.   **Law**

Review by this Court is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004) (quoting *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)). Rather, the District Court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Perkins*, 648 F.3d at 897.

In determining whether the evidence in the record as a whole is substantial, the Court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007) (quoting *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000)). Under this standard, substantial evidence means something "less than a preponderance" of the evidence, but "more than a mere scintilla." *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003)). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Perkins*, 648 F.3d at 897.

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a)(4). The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual

functional capacity and his or her age, education and work experience. *Id.* At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At step two, the claimant has the burden to prove he or she has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Id.* At step three, if the claimant shows that his or her impairment meets or equals a presumptively disabling impairment listed in the regulations, he or she is automatically found disabled and is entitled to benefits. *Id.*

If the claimant does not meet the listings, the ALJ determines the claimant's RFC, which the ALJ uses at steps four and five. *20 C.F.R. § 404.1520(a)(4).* At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.; see Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

A claimant's RFC is what he or she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545. RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, meaning 8 hours a day, for 5 days a week, or an equivalent work schedule. SSR 96-8p, *Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P

(S.S.A. July 2, 1996). The Eighth Circuit often expresses "skepticism about the probative value of evidence of day-to-day activities," and finds it "necessary from time to time" to remind the Commissioner "that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Reed v. Barnhart*, 399 F.3d 917, 923–24 (8th Cir. 2005) (quoting *Thomas v. Sullivan*, 876 F.2d 666, 666, 669 (8th Cir. 1989)). "[T]the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." *Id., Tr.* at 923.

The RFC must (1) give appropriate consideration to all of a claimant's impairments; and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016). The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin,* 786 F.3d 1126, 1131 (8th Cir. 2015). "To properly determine a claimant's residual functional capacity, an ALJ is therefore 'required to consider at least some supporting evidence from a [medical] professional.'" *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).

With respect to claims filed after March 27, 2017, the Social Security Administration has adopted new regulations about the weight afforded to treating physicians' opinions. 20 C.F.R. § 404.1520c; *see Pemberton v. Saul*, 953 F.3d 514, 517

(8th Cir. 2020).   Under the new regulatory scheme, the Commissioner "will not defer or give any specific weight, including controlling weight, to any medical opinion(s)," including those from treating physicians.   20 C.F.R. § 404.1520c(a).   Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion.   *Id.*   ALJs are required to "explain" their decisions as to the two most important factors—supportability and consistency.   20 C.F.R. § 404.1520c(b)(2).   The "more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be.   20 C.F.R. § 404.1520c(c)(1)-(2).   The ALJ is required to view a treating physician's opinion in the context of a claimant's entire medical record. *Despain v. Berryhill*, 926 F.3d 1024, 1028 (8th Cir. 2019).   An ALJ must give "good reasons" for the weight given to a treating physician opinion, irrespective of how much weight is given.   *See Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008); *see also Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005).

When evaluating a claimant's credibility as to subjective complaints, the ALJ must consider the *Polaski* factors.   *Grindley v. Kijakazi*, 9 F.4th 622, 629 (8th Cir. 2021); *see Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).   "Those factors include: 'the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions.'"   *Grindley*, 9 F.4th at 629 (quoting *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010)).   "Another factor to be considered is the

16

absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence." *Id.* (quoting *Halverson*, 600 F.3d at 931–32).  An ALJ may consider a conservative treatment history in discrediting subjective complaints.  *Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015).

To satisfy the burden to show the claimant is capable of performing other work, the ALJ is generally required to utilize testimony of a vocational expert if the claimant suffers from non-exertional impairments that limit his ability to perform the full range of work described in one of the specific categories set forth in the guidelines.  *Jones v. Astrue*, 619 F.3d 963, 972 (8th Cir. 2010).  In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.  20 C.F.R. §§ 404.1520(a)(4)(v); *see Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997) (stating that a vocational expert's testimony may be considered substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies").  "When a hypothetical question does not encompass *all relevant impairments*, the vocational expert's testimony *does not constitute substantial evidence*." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 377 (8th Cir. 2016) (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)) (emphasis added in *KKC*).

### III.   DISCUSSION

The Court finds the ALJ erred in several respects.[3]  This is a failed back surgery syndrome case.  Boettcher's complaints are reasonably consistent with his history of a work-related injury, repeated back surgeries, and continued debilitating pain.

The ALJ erred in discounting the opinions of Dr. Burd, Dr. Haughawout, and Dr. Hosford, who treated Boettcher for his back conditions for several years.  The ALJ improperly credited the assessments of consulting examiners over the opinions of three treating physicians—a surgeon and two pain management physicians—as well as physical therapists and a professional who performed a functional capacity evaluation at the request of a treating physician, who all opined that Boettcher had functional limitations that limited him to sedentary part-time work.

The ALJ failed to properly explain why he found the opinions unpersuasive.  The opinions were supported by medical evidence and were consistent with the opinions of other medical and non-medical sources.  The ALJ's reference to and reliance on "common experience" in connection with the medical opinions is misplaced.  The ALJ improperly questioned the objectivity and rigor of the FCE because the examiner offered

---

[3] Though it does not affect this determination, the ALJ made a factual error in finding that Boettcher had no positive leg raising testing.  To the contrary, Dr. Hosman's notes reflect positive leg raise testing at every appointment.  Arguably, Boettcher could have met the listing for a spine disorder under Listing 1.04.  In light of its resolution, the court need not address this issue.  The ALJ also factually erred in relying on evidence that predated the last of Boettcher's three surgeries to discount his credibility.

Further, though the ALJ stated that Boettcher had substantial gainful activity between October of 2017 and February 2018, the record shows that Mr. Boettcher's accommodated work as a customer service representative in October of 2017 through February of 2018 did not amount to substantial gainful activity but should be viewed as an unsuccessful work attempt.  Filing No. 17-6, Tr. at 219; see Program Operations Manual System (POMS) DI 10501.015 Tables of SGA Earnings Guidelines and Effective Dates Based on Year of Work Activity, available at https://secure.ssa.gov/poms.nsf/lnx/0410501015 (last accessed June 1, 2022).

18

to change the evaluation subject to new information from the physician.  An offer to revise an evaluation does not mean the evaluation is not objective.  The ALJ also discounted the surgeon's opinion because it was on a "check-the-box" form.  The opinion, however, was fully supported by medical reports, objective evidence, and assessments in the record.  The ALJ discounted Dr. Hosman's opinion because it was based in part on the FCE and on Dr. Burd's opinions and because at the time of the opinion, Dr. Hosman had examined Boettcher only three times.  Again, the medical records fully support Dr. Hosman's assessment.  It is common in the field of medicine for professionals to rely on the reports of other professionals.  Similarly, Dr. Haughawout's opinion was rejected by the ALJ, noting that Dr. Haughawout had reported that Boettcher's condition was improving and straight leg raising and Patrick-Fabere tests were negative.  The ALJ failed to recognize that straight leg raising tests were later positive.

In giving the treating physicians' opinions little weight, the ALJ failed to consider the length, frequency, nature, and extent of the physicians' treatment relationships with Boettcher, and ignored the physicians' areas of specialty, all in violation of applicable regulations.  *See* 20 C.F.R. § 404.1527(c) (listing all factors considered if a treating source's medical opinion is not given controlling weight).[4]  While an ALJ may give a treating physician's opinion less than controlling weight, there is nothing in this ALJ's decision to indicate that he considered the requisite factors when assessing the weight of the treating physicians' medical opinions.  He failed to give valid reasons for discrediting

---

[4] The Eighth Circuit has addressed the articulation standard in the new opinion regulations at 20 C.F.R. § 404.1520c and concluded it roughly approximates the old "good reasons" standard from 20 C.F.R. § 404.1527. *Bonnett v. Kijakazi*, 859 F. App'x 19 (8th Cir. 2021) (noting that 20 C.F.R. § 404.1520c requires an ALJ to consider supportability, consistency, and other factors in evaluating the persuasiveness of a medical opinion and must explain how both supportability and consistency factors are considered); *see also Phillips v. Saul*, No. 1:19-CV-34-BD, 2020 WL 3451519, at *2–3 (E.D. Ark. June 24, 2020) (discussing 20 C.F.R. § 404.1520c).

the treating physicians' opinions.  The record as a whole indicates the treating examiners' opinions should have been fully credited.

Further, the ALJ's criticisms of the treating physicians' opinions would apply with equal force to the opinions of the disability consultants on which the ALJ relied.  Those assessments are essentially on check the box forms and lack elaboration, explanation or citation to supporting medical evidence.  The disability consultants' opinions on Boettcher's RFC do not provide substantial evidence to counter the conflicting assessments of the treating physicians.  The medical evidence supports a finding that after the spinal cord stimulator surgery Boettcher had difficulty with being able to sit or stand for any length of time and could not fulfill the demands of full-time competitive employment.

The ALJ further erred in discounting Boettcher's subjective complaints.  His complaints of pain, weakness, and functional limitations are fully supported by the record and are consistent with his daily activities.  The ALJ did not provide sufficient reasons supported by substantial evidence on the record as a whole for finding Mr. Boettcher not credible in reporting his impairment-related limitations.  Boettcher's consistent work history prior to his work injury bolsters his credibility.  His unsuccessful work attempts also support his credibility.

The medical evidence supports Dr. Burd's assessment that Boettcher is not a malingerer.  Objective findings in the record such as X-rays, CT scans, MRIs and physical examinations are consistent with Boettcher's testimony as to the degree of severity of his pain.  He has consistently complained of and sought treatment for intractable pain over the course of many years.  This pattern of active treatment supports the reliability of his

complaints of debilitating pain.  He has undergone several surgeries, had epidural injections, participated in physical and aquatic therapy, and consistently taken medication to alleviate his pain.  The evidence supports a finding that Boettcher suffers from disabling pain in his lower back and legs and must frequently change position, lie down, and take prescribed medication to alleviate the pain.  There is also evidence that Boettcher has not exhibited drug-seeking behavior and the medications he takes for pain cause short term memory loss and inhibit his ability to function in the workplace.  The ALJ also erred in failing to consider the dosage and effect of his medications.

The ALJ's determination of Boettcher's RFC did not account for Mr. Boettcher's inability to work through an eight-hour workday as a result of his impairment-related sitting and standing limitations.  The ALJ's error in determining Boettcher's RFC consequently caused the ALJ to pose a hypothetical to the vocational expert that did not include all of Boettcher's functional limitations.  A finding that Boettcher is able to work for only 3-5 hours a day is supported by the medical evidence and by Boettcher's work history, which shows that his attempts to return to full-time work were unsuccessful.  Because the vocational expert testified that there would be no jobs in the national economy for a hypothetical individual with all of the limitations that are supported by the record, the Commissioner has not sustained his burden at step 5 of the sequential evaluation.  This Court finds that application of the five-step analysis results in a finding that Boettcher is disabled.

The clear weight of the evidence points to a conclusion that Boettcher has been disabled since his alleged onset date.  Where further hearings would merely delay receipt

of benefits, an order granting benefits is appropriate.  *See Hutsell*, 259 F.3d at 709. Accordingly,

IT IS ORDERED:

1. Plaintiff's motion to reverse (Filing No. 20) is granted.

2. Defendant's motion to affirm (Filing No. 22) is denied.

3. This action is remanded to the district court with directions to remand to the Commissioner for an award of benefits.

4. A judgment in accordance with this Memorandum Opinion will be entered.

5. The plaintiff shall file any motion for attorney fees within two weeks of the date of this order.

Dated this 8th day of June 2022.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge